NORTHERN PACIFIC RAILWAY COMPANY v. ABNER TOWNSEND
and Others.[1]

July 12, 1901.

Nos. 12,645—(173).

**Railroad Land—Adverse Possession.**

One who enters a tract of land under the United States homestead
laws, across which the Northern Pacific Railroad Company has previ-
ously constructed its line of road on the right of way provided for by the
congressional land-grant act of July 2, 1864, may, as against such com-
pany, acquire title to a part of such way by adverse possession for the
fifteen-years period prescribed by G. S. 1894, § 5134,—a statute of limita-
tions.

**Same—Entry under Homestead Law.**

The entry under the homestead laws was in the year 1882, and subject,
of course, to the previously acquired rights of the beneficiary named in
the land-grant act. The adverse possession began soon after, and
more than fifteen years prior to the commencement of this action to
regain possession. *Held*, that it is immaterial that the receiver's final
receipt was not issued to the entryman until December, 1887, and that
the United States patent was not executed until July, 1889.

Action in ejectment in the district court for Wadena county,
to recover possession of two strips of land, occupied by defend-
ants, on the original right of way of the plaintiff railway company.
The case was tried before Searle, J., who found in favor of plain-
tiff. From a judgment entered pursuant to the findings, defend-
ants appealed. Reversed.

*A. G. Broker*, for appellants.

*C. W. Bunn* and *James B. Kerr*, for respondent.

COLLINS, J.

Ejectment brought to recover possession of two strips of land
situate on either side of plaintiff's railway track, where the same
crosses three forties of the northwest ¼ of section 24, township
134, range 35.

[1]Reported in 86 N. W. 1007.

It is conceded that, under the land grant act of July 2, 1864, the filing of·a map of definite location in 1871, and by the construction of its railway, the Northern Pacific Railroad Company, plaintiff's predecessor, acquired a right of way four hundred feet in width where the road ran through and over what was then public domain, which included the quarter section in question. These strips were originally part of this way. The defendant · Minerva Townsend is the grantee of two persons who entered these forties under the United States homestead act subsequent to 1871, and to whom they were duly patented. She admits that the right of possession and possession, constructively, at least, were originally in the plaintiff's predecessor, but claims that possession and the right thereto have been wholly lost by reason of the fact that her grantors and herself have been in actual, open, notorious, and adverse possession of these strips, and cultivating the same, continuously for more than fifteen years before the commencement of this action. The court below so found, and that this had been with the knowledge of the officers and agents of plaintiff company, and of its predecessor, the original beneficiary of the act of congress by which the right of way was granted and its width fixed; but held that plaintiff was entitled to recover, because the right of way, as the same was fixed by the act of congress, was charged with a public use to its full width, and because, as a part of the railroad property, the way was inseparable from the franchise, and was not the subject of alienation. Therefore no part of it could be lost by adverse possession. Because of this peculiar public use to which the four hundred-foot strip had been devoted by the grant, it was held that the land in dispute was not subject to the operation of our statute of limitations as to adverse possession. On appeal the question is whether any part of the right of way, as fixed and granted by the act of congress, can be lost by adverse occupation for a period of fifteen years.

The argument of counsel for the railway company is that, as the right of way was granted by congress to the company to enable it to perform the duties which it owed to the public under its charter, and as the whole thereof was charged with a public

use, and as it is clear, upon principle and authority, that the company is without power to convey any portion thereof as granted, it inevitably follows that no part of this four hundred-foot strip is subject to any statute which would reduce its width, or prevent the plaintiff company from using it, as a whole, for railway purposes, and to its full width. The decisions, urge counsel, are conclusive on the proposition that a railway corporation owing duties to the public in the exercise of its corporate functions cannot, by voluntary conveyance or otherwise, part with any of its property necessary for a proper discharge of these duties.

A number of cases are cited in support of this statement. We see no reason to question the rules of law laid down in these cases, but, in our opinion, they are not in point here. One of them—Thomas v. Railroad Co., 101 U. S. 71—was where the defendant railway company undertook to lease all of its road, rolling stock, and its franchise, for which leasing no special authority had been conferred by its charter. The court held that such a contract was invalid. Another—East Alabama Ry. Co. v. Doe, 114 U. S. 340, 5 Sup. Ct. 869—was where a railroad corporation having a franchise to own and operate a road acquired an easement for its right of way through certain lands partly by grant and partly by condemnation. After a part of its line was graded, a judgment creditor levied an execution on the right of way, and it was sold and conveyed to him by the sheriff. The court held that, by itself and separately, the right of way could not be sold on execution, and that the creditor had obtained no title.

In both these cases the acts complained of (a lease in one case, and a forced sale of the right of way in the other—an actual dismemberment of this right from the franchise) were of such a nature that the corporations could not perform the functions for which they were created, or the duties which they owed to the public, should the acts be upheld. In the Thomas case the act of the company was clearly ultra vires, for it had no authority to lease, and in attempting so to do was disabling itself from performing its corporate functions. In the Doe case the control-

ling idea was that the right of way, being a mere easement in the land, was indissolubly linked, so long as they should exist, to the franchise, to the purpose of the existence of the corporation, and to its public functions, and that they could not be separated by a sale of the right of way.

The present case is not parallel to either of these. Here the company built its road more than twenty years ago, fenced a strip one hundred feet in width,—fifty feet on each side of its track center,—has used that strip, and no more, and has acquiesced in the use and cultivation by defendants and their predecessors of all of its original grant lying outside of its fences for more than fifteen years, under a claim of right. It has not attempted to lease its entire property, nor has there been a proceeding in invitum whereby it could be prevented, by an actual dismemberment of its right of way from its franchise, from properly exercising its corporate functions, or from performing its duties to the public. But in this connection we call attention to Crolley v. Minneapolis & St. L. Ry. Co., 30 Minn. 541, 16 N. W. 422, wherein it was said, when considering a conveyance by a railway corporation, that no one whose interests are not affected, except the state, can call in question the capacity of the corporation to sell or hold property.

But counsel point with emphasis to the case of Northern Pac. R. Co. (the predecessor of this plaintiff) v. Smith, 171 U. S. 260, 18 Sup. Ct. 794, as being conclusive here. We take their statement of the facts in issue as correct. Smith brought an action in ejectment against the company to recover possession of certain premises situated within two hundred feet of its track center as built within the limits of the town of Bismarck, North Dakota. It appeared that the company had originally located its line some distance south of the present site of that town, and had filed its map of definite location in the office of the commissioner of the general land office. Thereafter, in 1873, and without filing any new map, the company changed its location, and constructed its road just where it has since remained. Afterwards—in 1879— the town site of Bismarck, including the tract sued for, was patented to the mayor, and the same year a deed of conveyance

covering the premises in question was executed to Smith by the town authorities. Upon these facts the court held that, under the act or grant of congress, and by virtue of the construction of its road, the company obtained a right of way two hundred feet in width upon either side of the center line of its tracks as the same were laid upon the ground; that the rights of the plaintiff were subject to this grant to its specified width, and that the tenants of the company could not be ejected from the property in dispute. That part of this decision to which attention has been called is as follows:

"By granting a right of way four hundred feet in width, congress must be understood to have conclusively determined that a strip of that width was necessary for a public work of such importance, and it was not competent for a court, at the suit of a private party, to adjudge that only twenty-five feet thereof were occupied for railroad purposes, in the face of the grant, and of the finding that the entire land in dispute was within two hundred feet of the track of the railroad as actually constructed, and that the railroad company was in actual possession thereof by its tenants."

It having been decided in this case that by its grant congress conclusively determined that a strip four hundred feet in width was necessary for a right of way, and, further, that a court could not cut it down to twenty-five feet, it is urged that it must follow that our statute of limitations cannot apply to any part of this grant, because the result would be to cut down the right of way to less than four hundred feet in width. But, in answer to this, attention may be called to the fact that in every state where the width of a railway right of way is fixed by statute the legislature has quite as conclusively determined what width is necessary for the purpose as has congress by the act in question.

It is impossible for us to see that the doctrine established in the Thomas case is determinative of this, or is in point at all. The mere fact that congress had conclusively determined that the right of way should be four hundred feet in width across the public domain, and thereupon it was decided that what was thus declared to be necessary could not be cut down by the courts,

does not infringe at all upon defendant's claim that the plaintiff company may lose a portion of its original right of way by adverse possession, and be barred from recovery by the fifteen-years statute of limitations. The question was whether, upon shifting its track line after filing a map of definite location, the company took a right of way under the act of congress, and to the width therein described, or a way of less width,—what it actually used. Surely, no private person could question the right of the company to change its line, unless his rights had intervened, and had become attached to land in dispute, prior to such change. If this right to change could not be questioned, it would necessarily follow that the federal government only could insist that the width of the right of way was not the same, wherever the road might actually be constructed. No criticism could well be made of the language used, or the conclusion reached; but neither language nor conclusion control this case any more than they would if the right of way had been obtained under a provision of an act passed by the legislature of one of the states, or by purchase.

But it is rather singular, when we consider the assertion made by counsel as to the impossibility of a railway company to part from any portion of its right of way voluntarily or involuntarily, that in the Smith case the right to lease was recognized, for the only possession relied upon by the plaintiff company was that of its tenants, concerning which the court said: "The precise character of the business carried on by such tenants is not disclosed, but the court is permitted to presume that it is consistent with the public duties and purposes of the railroad company." By this quoted expression the court distinctly recognized that the defendant company had leased, and had the power so to do, when the occupation of its tenants was not inconsistent with or opposed to the proper operation of its road and to the performance of its duties as a common carrier. And we are safe in saying that on the facts now before us the presumption arises that the occupation by defendants of the tract in question, outside of the plaintiff's fences, conflicts not at all with a proper operation of its

railway, and is not in the way of a complete performance of plaintiff's duties to the public.

The real object of this statute of limitations is to prevent litigation, and to quiet title to land which has remained in the possession of another adversely and in hostility to its true owner for the specified period of time. Such a law is a continual and decisive notice to owners that, if they allow others adversely to occupy, use, and improve their land for fifteen years continuously, they must be deemed to have acquiesced in the assertion of the occupants' claim of right to use the same, and to have abandoned all opposition thereto. There may be exceptional instances in which the nature of the right affected or the character of the party in whom the title is vested will prevent the operation of the statute, but the facts here do not come within the exception. That a railway company may be deprived of a part of its right of way by adverse occupation for the statutory period of time, and that such an occupation will bar its right to eject its adversary, has often been determined by the courts of this country. Pittsburgh v. Stickley, 155 Ind. 312, 58 N. E. 192; Matthews v. Lake Shore, 110 Mich. 170, 67 N. W. 1111; Littlefield v. Boston, 146 Mass. 268, 15 N. E. 648; Illinois v. Wakefield, 173 Ill. 564, 50 N. E. 1002, and cases cited. See also upon this subject, 15 Harv. Law Rev. 146. It has also been decided that it is immaterial whether title is held by the company in fee simple, or is a mere easement, or a qualified fee, or an absolute fee; for, whichever it is, the right conferred is a possessory one, and sufficient to sustain an action of ejectment.

Nor is it material whether the statute, under which the defendants claim, is regarded as one indulging in the presumption of a grant by the true owner or is simply a statute of repose. We have held that it is the latter in Dean v. Goddard, 55 Minn. 290, 56 N. W. 1060. We have also decided that real property belonging to municipal corporations and quasi public corporations can be lost under the statute by adverse possession. City of St. Paul v. Chicago, M. & St. P. Ry. Co., 45 Minn. 387, 48 N. W. 17; St. Paul, M. & M. Ry. Co. v. City of Minneapolis, 45 Minn. 400, 48 N. W. 22; Village of Wayzata v. Great Northern Ry. Co., 50

Minn. 438, 52 N. W. 913. Municipal corporations hold real property for public use and for public purposes in a greater sense than do railway companies hold their right of way. There is no reason whatever for determining that the former are subject to the operation of the statute, and at the same time hold that the latter are exempt from the operation of the same law. Such a conclusion would take front rank among the legal absurdities.

Let us look at the judgment from which the defendants have appealed from a practical standpoint, and see what it means if the contention of plaintiff's counsel be sustained. The right of way granted under the act of July 2, 1864, was east and west across and through this state from Lake Superior to the Red River of the North, over the public domain. Although part of the territory to be traversed had been disposed of by the federal government prior to the passage of the act, the grant came very near being a strip of land four hundred feet wide for about two hundred and fifty miles. If plaintiff's claim be upheld, we should have, stretching across the state from east to west, a strip of territory four hundred feet wide, upon which no person could travel without committing a trespass; over which no railway company could obtain the right to lay its rails; and across which no public highway could be established, except by consent of plaintiff. If counsel should be sustained, the public could not obtain the right, by proceedings under the statutes, or even by prescription, to a public way for ordinary travel, and municipal authorities would have to enter into private negotiations with plaintiff in order to secure the privilege of a highway crossing of this strip; and so would corporations organized for public purposes, and equipped with the right of eminent domain. Any and all of these proceedings would be as inimical to the rule which counsel assert in this case, and quite as open to the objections now relied upon, as is the application of the statute of limitations as to adverse possession to the facts now before us. It would be preposterous to announce a rule of law which would uphold and permit such a result. No matter what rights the beneficiary of the grant may have to use and occupy, if it so chooses, its right of way over and through public domain to the full extent of four hundred

feet, it is obvious that it must take this right subject to the statute relating to adverse possession. No other conclusion can be tolerated.

As to one forty of the three, it is claimed that from the findings it clearly appears that the strips therein have not been, and could not be, held adversely for the full period of fifteen years prior to the commencement of this action. From the record it seems that this tract of forty acres was entered under the homestead laws of the United States by a man named Brown, February 1, 1882, subject, of course, to the provisions of the prior grant to the Northern Pacific Company. A receiver's final receipt was issued to him December 26, 1887, and a patent July 24, 1889. The claim is that prior to the time of the issuance of the final receipt Brown was occupying the forty in subordination to the title of the United States, and could not avail himself of the statute of limitations. It is urged that he could not and was not holding possession adversely to all titles and to all claimants, and for this reason the statute does not apply.

But it is immaterial when Brown obtained evidence of his title, —his paper title. He initiated his adverse and hostile claim to the strips in dispute upon making his homestead entry, more than fifteen years prior to the commencement of this action. He and his grantors continuously thereafter occupied parts of the forty with intent to claim the same as against the company. His entry and possession were adverse. Both were hostile in their origin, and hostile in their continuance. As to both strips, Mr. Brown and the defendants were precisely in the position of any one who had entered into possession thereof under a claim of title, and without reference to the balance of the forty.

But, if this were not so, and his and their title to these strips had to depend upon and be connected with his homestead entry, the fact is that, upon making this entry, in 1882, his rights to the forty became fixed and certain. They were not subordinate to the government title, and could not be taken away from him by any other person, natural or artificial; and when the patent was issued to him, in the year 1889, it related back, for all purposes, to the time of the original entry. No distinction between the

forties can be made when considering and determining the question in issue.

The judgment appealed from is reversed, and upon remittitur judgment may be entered in favor of the defendants.